1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11   NOELLA G. SCHNELL,              )  Civil No. 05-CV-2251-BEN(LSP)
                                     )
12                    Plaintiff      )
                                     )  REPORT AND RECOMMENDATION
13   v.                              )  GRANTING DEFENDANT'S MOTION
                                     )  FOR SUMMARY JUDGMENT (11-1)
14   JO ANNE B. BARNHART,            )  AND DENYING PLAINTIFF'S MOTION
     Commissioner of the Social      )  FOR SUMMARY JUDGMENT (10-1)
15   Security Administration,        )
                                     )
16                    Defendant      )
                                     )
17   _____ )

18

19            **I.  STATEMENT OF THE CASE**

20        On December 19, 2002, Noella Schnell (Plaintiff) applied

21   for disability insurance benefits under Titles II and XVI of the

22   Social Security Act. (Administrative Record, hereinafter "R." at

23   43-45.)  Jo Anne B. Barnhart, Commissioner of the Social Security

24   Administration (Defendant), denied the application both initially

25   and upon reconsideration. (R. at 24-27, 30-33.)  On October 31,

26   2003, Plaintiff requested a hearing before an Administrative Law

27   Judge (ALJ). (R. at 34, 38.)  On July 14, 2004, the hearing was

28   held.  Plaintiff and a vocational expert were present and

testified. (R. at 260-313.)  On January 13, 2005, the ALJ denied

Plaintiff's application (R. at 15-21) and on October 14, 2005, the

Appeals Council declined to review the matter. (R. at 5-7.)  On

December 12, 2005, Plaintiff filed a complaint for Judicial Review

& Remedy on Administrative Decision pursuant to 42 U.S.C. §

405(g).

On October, 10, 2006, Plaintiff filed a Motion for Summary

Judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure.  On November 11, 2006, the Defendant filed a Cross

Motion for Summary Judgment. On November 9, 2006, the District

Judge assigned to this case referred the Motions for Summary

Judgment to the undersigned for Report and Recommendation.  This

matter is now pending before the court.

**II.  STATEMENT OF FACTS**

**A.  Medical Background and Administrative Hearing**

Plaintiff was born on December 21, 1963 and was 41 years

old at the time of the hearing before the ALJ. (R. at 15.)

Plaintiff has completed approximately 13 years of education, is

unmarried, and lives with her parents. (R. at 15, 297, 301.)

Plaintiff's relevant work experience includes working as a

secretary for over 10 years, grocery cashier work she performed

for over a year, and a parking lot attendant position she held for

17 months. (R. at 61-67, 95, 98.)

Plaintiff additionally worked as a Salvation Army "bell

ringer," a cosmetologist, and an usher at the Palomar College

theater. Id.   The ALJ did not take these jobs into account as

they were performed for short periods of time and did not qualify

as substantial gainful activities (SGA). See 20 C.F.R. 404.1572-

1  .1573 (defining SGA).

2      Shortly before the administrative hearing, Plaintiff was a

3  student at Palomar College where she was enrolled in theater and

4  automotive repair courses. (R. at 262-63.)  Plaintiff had been

5  attending Palomar College since at least 2003 and was able to

6  carry 9 unit class loads. (R. at 273-74.)  She additionally worked

7  as an usher in the college theater for approximately three hours

8  per week. (R. at 262-63.)

9      In 1979, Plaintiff was involved in a skiing accident

10  whereby she sustained right shoulder injuries that never healed

11  properly. (R. at 180-83.)  Plaintiff continues to have recurring

12  problems with periodic right shoulder dislocation and has been

13  diagnosed with "right shoulder instability." (R. at 180-81, 183,

14  186.)  Her treating and examining physicians unanimously agree

15  that use of Plaintiff's right shoulder is limited to below the

16  shoulder area. (R. at 110, 186, 192, 198, 253.)

17      In addition to her shoulder injury, Plaintiff has

18  complained of, *inter alia*, photosensitivity, urinary tract

19  infections, generalized body aches, abdominal pain, joint pain,

20  generalized numbness, fatigue, and rashes. (R. at 128, 119, 146,

21  168, 183-86, 241.)  Plaintiff also has a history of positive and

22  negative Antinuclear Antibodies (ANA)[1] tests that are indicative

23

24      [1] A positive ANA test is indicative of various diseases, can be drug-
25  induced, or even appear in normal persons.  Antinuclear antibodies are
        [a] group of antibodies that react against normal components
        of the cell nucleus.  These antibodies are present in a
26      *variety* of immunological diseases, including systemic lupus
        erythematosus, progressive systemic sclerosis, Sjogren's
27      syndrome, scleroderma, polymyositis, and dermatomyositis, and
        in some persons taking hydralazine, procainamide, or
28      isoniazid.  *In addition, ANA is present in some normal
        individuals.*
   Taber's Cyclopedic Dictionary 138-39 (19th ed. 2001) (emphasis added).

1   of several diseases such as systemic lupus erythematosus (lupus or

2   SLE)[2]. (R. at 130-31, 133-35, 227, 243.)  Despite these complaints

3   and being evaluated by at least 10 separate doctors, Plaintiff has

4   never been positively diagnosed with any ailment beyond the right

5   shoulder injury.

6       The medical evidence in the record begins in 1990, when Dr.

7   William Pincus saw Plaintiff on a referral from Dr. Lawrence

8   Schnell. (R. at 133-35.)  Dr. Pincus made a cautious diagnosis of

9   "systemic lupus erythematosis [sic] of a mild variety." (R. at

10  135.)  However, Dr. Pincus noted that, while this was the most

11  likely diagnosis, it was not a definitive one. Id.  Dr. Pincus

12  also noted that Plaintiff reacted positively to the medication

13  Voltaren[3]: "Her response to [Voltaren] was excellent with almost

14  complete resolution of her discomfort." Id.  After this visit, the

15  record does not contain another medical visit until 1992.  At that

16  time, Dr. Kaplan ordered a blood test that ultimately revealed

17  negative ANA results. (R. at 130-31.)

18      According to the record, the plaintiff did not see another

19  physician until 1998, when Dr. Birchall evaluated Plaintiff for

20  complaints of generalized body aches with fevers and chills for 3

21

_____

22      [2] SLE is "[a] chronic autoimmune inflammatory disease involving multiple
    organ systems and marked by periodic acute episodes." Id. at 1264.  One is
23  diagnosed with SLE
        if four or more of the following criteria are present, either at one
24      time or sequentially: 1. Butterfly rash; 2. raised, scaly discoid
        skin lesions; 3. antinuclear antibodies...; 4. immunological
        disorders including lupus erythematosus (LE) cells or other
25      autoantibodies; 5. pleuritis or pericaditis; 6. hemolytic anemia,
        leukopenia..., lymphopenia..., or thrombocytopenia...; 7. oral or
26      nasopharyngeal ulcers; 8. nonerosive arthritis; 9. psychosis or
        convulsions without clear cause; 10. photosensitivity skin rash; 11.
        proteinuria...
27  Id.

28      [3] Voltaren is a "nonsteroidal anti-inflammatory drug" used for "relief of
    the signs and symptoms of osteoarthritis...[and] rheumatoid arthritis."
    Physicians' Desk Reference 2307-08 (61st ed. 2007).

                                    4                          05CV2251

1   days. (R. at 128.)  Dr. Birchall suspected an unspecified

2   infection and prescribed Cipro. Id.  Plaintiff's next medical

3   visit was four years later, in 2002.

4        The bulk of the Plaintiff's medical records begin in 2002,

5   when at least 7 separate physicians examined Plaintiff.  Plaintiff

6   predominantly complained of urinary tract infections, abdominal

7   pain, shoulder pain, and general joint pain. (R. at 114, 119, 159,

8   168, 172, 180.)  Though Plaintiff reported to doctors that she had

9   been diagnosed with lupus, the medical record indicates that

10  Plaintiff did not have any lupus-related symptoms or ANA tests in

11  2002.  During this time, Plaintiff began seeing one of her

12  treating physicians, Dr. Chen.

13       On April 11, 2002, Dr. Chen first evaluated Plaintiff for

14  joint pain and Dr. Chen declined to complete Plaintiff's

15  disability forms. (R. at 172.)  On April 22, 2002, Dr. Chen

16  evaluated Plaintiff for similar complaints and advised Plaintiff

17  to engage in aerobic exercise and moderate activity. (R. at 171.)

18  Next, on September 6, 2002, Dr. Chen evaluated Plaintiff. (R. at

19  150.)  Plaintiff complained of right shoulder pain and stated she

20  was contemplating becoming an auto mechanic. Id.  Dr. Chen advised

21  Plaintiff to avoid "mechanic work," and wrote that Plaintiff would

22  have to engage in low impact work if no treatment was available

23  for her shoulder injury. Id.  Dr. Chen referred Plaintiff to Dr.

24  Paul Milling for an orthopedic consultation.

25       Dr. Milling found Plaintiff had full range of motion in her

26  right shoulder but found it was tender and Plaintiff exhibited

27  signs of apprehension.  (R. at 180.)  Dr. Milling advised

28  Plaintiff to consider further shoulder surgery despite a decreased

1  chance for success and likely loss of motion. Id.  Dr. Milling

2  neither issued a diagnosis nor had an opinion about Plaintiff's

3  work limitations.  Dr. Milling's evaluation was Plaintiff's final

4  medical visit in 2002.

5       On March 14, 2003, Dr. Thomas Dorsey completed an

6  orthopedic consultation at the request of the Social Security

7  Administration (SSA). (R. at 183-86.)  Dr. Dorsey's examination

8  revealed Plaintiff was in general good health with "grossly

9  normal" range of motion in her shoulders, elbows, wrists, hips,

10  knees, and ankles. (R at 185.)  Dr. Dorsey diagnosed Plaintiff

11  with "right shoulder instability" after a full examination. (R. at

12  186.)  Dr. Dorsey's examination revealed two other abnormalities

13  besides Plaintiff's right shoulder injury: decreased sensation to

14  the fingers of Plaintiff's right hand as compared to her left hand

15  and decreased sensation in Plaintiff's right foot as compared to

16  her left foot. (R. at 285.)  Dr. Dorsey's evaluation concluded

17  with an opinion with respect to Plaintiff's work limitations:

18         The patient apparently is able to do some type of
           physical activities since the bilateral hands show
19         grease on them today.  She should be doing no
           overhead activities.  Lifting and carrying to the
20         level of the waist would be 20 pounds occasionally
           and 10 pounds frequently.  There are no other
21         limitations.

22  (R. at 186.)  Shortly after Plaintiff's visit with Dr. Dorsey, the

23  SSA requested that a state agency medical expert assess

24  Plaintiff's physical residual functional capacity[4] (RFC).

25       On March 27, 2003, the state agency medical expert, Dr.

26  James Haaland, completed a consultative report for the SSA. (R. at

27

28
    _____

       [4] One's residual functional capacity is the most work a claimant can still
    perform despite his or her impairment(s) and limitations. 20 C.F.R. 404.1545.

189-200.)  Dr. Haaland found Plaintiff had the ability to lift or
carry 20 pounds occasionally and 10 pounds frequently, stand or
walk for about 6 hours, and sit for 6 hours in an 8-hour workday.
(R. at 190.)  Dr. Haaland found the Plaintiff could not perform
work above the shoulder level with her right arm. (R at 192.)  Dr.
Haaland also noted: "The [claimant] is credible ref. the alleged
symptomology, but not its severity." (R. at 194.)

On July 28, 2003, Plaintiff saw Dr. Chen, complaining of
fatigue for four months, weakness, and tenderness in all her
extremities. (R. at 146.)  Dr. Chen found Plaintiff had a fading
rash on her chest, legs, and arms, ordered laboratory tests, and
prescribed over-the-counter allergy medication. Id.  On August 15,
2003, Plaintiff's test results indicated a positive ANA. (R. at
227.)  On August 29, 2003, Plaintiff returned to Dr. Chen.  Dr.
Chen took note of Plaintiff's positive ANA test and her "[history]
of 'mild lupus.'" (R. at 147.)  However, Dr. Chen did not diagnose
Plaintiff with any ailment related to these findings and did not
prescribe additional medication. Id.  Nonetheless, Dr. Chen
completed a "Physical Capacities Evaluation" form provided by
Plaintiff. (R. at 201-02.)

Portions of the opinion Dr. Chen expressed on this form
were consistent with those of other physicians while other
portions were inconsistent. See discussion infra part IV.D.i.
Additionally, in response to questions on the form, Dr. Chen
delivered opinions that no other doctor had expressed.
Additionally, the form contained fields for "Diagnosis,"
"Symptoms," and "Type of Treatment (i.e., medications)." (R. at
202.)  Based on "generalized pain [and] weakness" symptoms, Dr.

1   Chen diagnosed Plaintiff with "possible lupus" with a treatment of

2   "diclofenac."[5] Id.   Dr. Chen's report did not mention any right

3   shoulder limitations.

4        After the August 29, 2003 visit with Dr. Chen, the record

5   contains 10 separate medical visits.  (R. at 143, 214, 210, 209,

6   207, 204, 218, 235, 240, 241 (in chronological order).)  Plaintiff

7   had various complaints, both related and unrelated to the present

8   action.  Most notably, during a June 1, 2004 visit with Dr. Chen,

9   Plaintiff reported: "feeling weak. Gets tired curling her hair.

10  Feels like she's really heavy." (R. at 218.)  Dr. Chen prescribed

11  Zantac and recommended gentle stretching and aerobic exercise (R.

12  at 218) and subsequently prescribed physical therapy 3 times per

13  week for 4 weeks (R. at 235).  During a subsequent visit to Dr.

14  Birchall, Plaintiff was prescribed Voltaren for pain. (R. at 241.)

15  Dr. Birchall noted that the etiology of Plaintiff's pain

16  "remain[ed] elusive" and opined that she could work "6-8 hrs/day

17  with [illegible]."[6] Id.  From August 29, 2003 to July 14, 2004, no

18  doctor positively diagnosed Plaintiff with systemic lupus

19  erythematosus or any other ailment not heretofore discussed.

20       On July 14, 2004, an administrative hearing was held before

21  Administrative Law Judge Samuel Durso. (R. at 260-313.)  The

22  Plaintiff testified on her own behalf.

23       A vocational expert, Connie Guillory, also testified at the

24  hearing. (R. at 306-10.)  The ALJ asked Ms. Guillory two

25  hypothetical questions to determine whether Plaintiff could

26

27       [5] Diclofenac is a generic version of Voltaren.  Physicians' Desk Reference
    2307 (61st ed. 2007).

28       [6] The exact date of this visit is unclear.  It is clear that the visit took
    place in July 2004.  However, the exact date has been written over and appears to
    be either a 6, 12, or 16. (R. at 241.)

1    perform her past relevant work.  The first hypothetical question
2    was based on Plaintiff's residual functional capacity as described
3    by Dr. Lin, Dr. Dorsey, and Dr. Haaland. (R. at 307-08.)  Ms.
4    Guillory responded that Plaintiff could return to her previous
5    cashier and secretary jobs but not the parking lot attendant
6    position.  The second hypothetical was based solely on Dr. Chen's
7    August 29, 2003 "Physical Capacities Evaluation" report. (R. at
8    308-09.)  Ms. Guillory responded that the Plaintiff would not be
9    able to work if the information in the "Physical Capacities
10   Evaluation" report was true. (R. at 309.)

11        Before the ALJ concluded the administrative hearing, he ALJ
12   expressed doubts about Plaintiff's lupus claims and Dr. Chen's
13   August 29, 2003 findings. (R. at 310-12.)  The ALJ expressed the
14   desire to further examine the lupus claim and ordered an
15   "internist endocrinologist examination." (R. at 311.)

16        On September 11, 2004, Dr. Henry Lin, an internal medicine
17   specialist, examined Plaintiff. (R. at 245-54.)  Dr. Lin reviewed
18   Plaintiff's medical records and took notice of her lupus
19   complaint, the history of positive and negative tests, Plaintiff's
20   history of shoulder injuries, and her complaints of general pain
21   and weakness. (R. at 245-46.)  Dr. Lin's physical examination
22   revealed that Plaintiff was in general good health and had full
23   range of motion in most of her extremities. (R. at 247-48.)  Based
24   on this assessment, Dr. Lin opined that Plaintiff did not have
25   lupus and her only limitation was a right shoulder injury. (R. at
26   232.)

27                    **B.  The ALJ's Decision**
28        On January, 13, 2005, the ALJ issued his decision.  He

1   determined that the Plaintiff "retain[ed] the residual functional

2   capacity to perform a range of light work." (R. at 20.)  The ALJ

3   credited her right shoulder impairment but discounted Plaintiff's

4   lupus testimony. Id.  In doing so, he set forth Plaintiff's

5   relevant medical visits and cited a lack of reliable medical

6   evidence, conservative treatment, and lack of a definitive lupus

7   diagnosis. (R. at 19-20.)  The ALJ also discounted Plaintiff's

8   subjective complaints of pain and weakness, citing lack of and

9   medical evidence for the pain and Plaintiff's continued

10   activities. (R. at 19.)

11        Additionally, the ALJ discounted Dr. Chen's August 29, 2003

12   report because

> Dr. Chen's opinion of work limitations [was] not
> supported by the evidence of record considered as a
> whole, including the records of Dr. Chen.  The
> claimant underwent intermittent sporadic treatment
> and had generally unremarkable signs.  The claimant's
> major complaint was shoulder dislocation and she did
> not report signs or symptoms consistent with the
> opinion of Dr. Chen as regards any continuous period
> of not less than 12 months.

18   (R. at 18.)  Because Ms. Guillory's opinion, that Plaintiff could

19   not work, was based on Dr. Chen's report, the ALJ disregarded her

20   opinion as well. (See R. at 20 (relying on the first hypothetical

21   posed to Ms. Guillory).)

22        The ALJ also disregarded Dr. Birchall's July 2004 opinion

23   that Plaintiff could work 6-8 hours because "[n]o opinion is set

24   forth regarding duration, nor are there longitudinal objective

25   medical records in support of the opinion rendered." (R. at 19.)

26   Ultimately the ALJ determined Plaintiff was able to return to her

27   cashier and secretary positions and found she was not eligible for

28   disability benefits.

05CV2251

### III.  LEGAL BACKGROUND AND STANDARD OF REVIEW

### A.  Summary of Applicable Law

Title II of the Social Security Act (hereinafter "Act"), as amended, provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1)(D) (Supp. III 1982). Title XVI of the Act provides for the payment of disability benefits to indigent persons under the Supplemental Security Income (SSI) program. § 1382(a).  Both titles of the Act define "disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months..." Id.  The Act further provides that an individual

> [S]hall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id.

The Secretary of the Social Security Administration has established a five-step sequential evaluation process for determining whether a person is disabled.  20 C.F.R. §§ 404.1520, 416.920 (1986).  Step one determines whether the claimant is engaged in "substantial gainful activity."  If he is, disability benefits are denied. §§ 404.1520(b), 416.920(b).  If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of

impairments.  That determination is governed by the "severity regulation" at issue in this case.  The severity regulation provides in relevant part:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.  We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." §§ 404.1521(b), 416.921(b).  Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; [u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting." Id.

If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. §§ 404.1520(d), 416.920(d); 20 C.F.R. pt. 404, subpt. P, App. 1 (1986).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth

1   step, which determines whether the impairment prevents the

2   claimant from performing work he has performed in the past.  If

3   the claimant is able to perform his previous work, he is not

4   disabled. §§ 404.1520(e), 416.920(e).  If the claimant cannot

5   perform his previous work, the fifth and final step of the process

6   determines whether he is able to perform other work in the

7   national economy in view of his age, education, and work

8   experience.  The claimant is entitled to disability benefits only

9   if he is not able to perform other work. §§ 404.1520(f),

10   416.920(f).

11               **B.   STANDARD OF REVIEW**

12        This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

13   In a Social Security case, the Commissioner's denial of benefits

14   "will be disturbed only if it is not supported by substantial

15   evidence or is based on legal error." Brawner v. Secretary of

16   Health and Human Services, 839 F.2d 432, 433 (9th Cir. 1988)

17   (citing Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)).

18   Substantial evidence means "more than a mere scintilla" but less

19   than a preponderance.  Sandgathe v. Chater, 108 F.3d 978, 980 (9th

20   Cir. 1997) (citation omitted).  "[I]t is such relevant evidence as

21   a reasonable mind might accept as adequate to support a

22   conclusion." Id. (quoting Andrews v. Shalala, 53 F.3d 1035, 1039

23   (9th Cir. 1995)).  The court must consider the record as a whole,

24   examining both the evidence which supports the ALJ's conclusions

25   and that which detracts therefrom.  Jones v. Heckler, 760 F.2d

26   993, 995 (9th Cir. 1985).  "In reaching his findings, the law

27   judge is entitled to draw inferences logically flowing from the

28   evidence." Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).

1   If the evidence supports more than one rational interpretation,

2   the court must uphold the ALJ's decision.  <u>Allen v. Heckler</u>, 749

3   F.2d 577, 579 (9th Cir. 1984).  Thus, when the evidence is

4   inconclusive, "questions of credibility and resolution of

5   conflicts in the testimony are functions solely of the Secretary."

6   <u>Schweiker</u>, 694 F.2d at 642 (internal quotations and citation

7   omitted).

8                        **IV.  DISCUSSION**

9             **A. Plaintiff's Residual Functional Capacity.**

10        Plaintiff argues that the ALJ posed an incomplete

11   hypothetical question to Ms. Guillory and could not rely on her

12   response. (Pl.'s Mem. Supp. Summ. J. 4, 5:22-6:14.)  Specifically,

13   Plaintiff points to a portion of the hypothetical question in

14   which the ALJ stated Plaintiff "*may* work above shoulder level with

15   the right upper extremity." [R. at 308 (emphasis added)]

16   Plaintiff argues the hypothetical question was incomplete because

17   Plaintiff cannot work above shoulder level and Ms. Guillory's

18   subsequent response has no evidentiary value. <u>Id.</u>  Defendant

19   responds by encouraging the court to "assume the ALJ said 'no'

20   work above the shoulder rather than 'may' work above the shoulder"

21   because the ALJ knew about Plaintiff's impairment and did not

22   suggest Plaintiff could perform above-shoulder work elsewhere in

23   the record. (Mem. Points Authorities Supp. Def.'s Cross-Mot.

24   10:21-26.)  Neither party provided evidence to the Court or

25   verified whether the error was made by the ALJ or transcriber.[7]

26

27        [7] Plaintiff argues that the hearing transcript is accurate based on the transcriber's certification that the transcript was a "true and complete transcription of the testimony." (R. at 313; Pl.'s Mem. Supp. Summ. J. 2:4-15.)

28   However the court discovered at least one glaring error in the transcript: While the hearing took place on July 14, 2004, the transcript is dated July 14, 2005. (R. at 260.)

1    The Court finds the Defendant's argument unpersuasive and cannot

2    assume the ALJ stated "may" but meant "no."

3           Plaintiff's argument is also unpersuasive.  Plaintiff's

4    selective quotation of the record excludes the first half of the

5    ALJ's sentence.  The full sentence reads: "She would need to avoid

6    overhead controls, working -- may work above the shoulder level

7    with the right upper extremity . . ." (R. at 308.)  Taken as a

8    whole, the ALJ's sentence is at best unclear since it appears that

9    the ALJ states the Plaintiff is simultaneously able and unable to

10   work above shoulder level.  Had the hearing ended immediately

11   after Ms. Guillory's response to this question, there would be

12   sufficient cause to remand this case.  However, the hearing

13   continued and Plaintiff questioned Ms. Guillory shortly after the

14   ALJ's unclear hypothetical question.  Plaintiff ultimately

15   clarified the ALJ's question.

16          Plaintiff's examination of Ms. Guillory consisted of one

17   question:

18          Q   I just have one question and that is, with the first
            hypothetical which I believe corresponds to Exhibit 5F
19          [Record pages 189-200] -- but nevertheless, would the
            Claimant or the hypothetical person be able to perform the
20          Claimant's past relevant work if her lifting and carrying
            were limited to the level of the waist for the 20 pounds
21          occasionally and the level of the waist at 10 pounds
            frequently, *so all her lifting and carrying would be at the*
22          *waist level*?

23   (R. at 309.)  This hypothetical question restricted Plaintiff's

24   activity to *waist* level.  The limitation posed in Plaintiff's

25   hypothetical question is more restrictive than Plaintiff's actual

26   abilities because Plaintiff is capable of performing work from the

27   waist to the shoulder area.  Yet, despite this more restrictive

28   hypothetical question, Ms. Guillory responded that such a

1  condition would not preclude Plaintiff from performing her past

2  secretarial position and could still perform 65%-80% of cashier

3  jobs comparable to her past position. (R. at 310.)

4      In sum, it appears that the ALJ's hypothetical question was

5  unclear at best.  However, Plaintiff's subsequent restrictive

6  hypothetical question served to clarify the ALJ's unclear

7  hypothetical question.  Plaintiff's hypothetical question also

8  provided sufficient evidence in the record to convince the Court

9  that Ms. Guillory's opinion was based on factors that reflected

10  Plaintiff's true residual functional capacity.  The ALJ was

11  present at the hearing and heard Ms. Guillory's response to

12  Plaintiff's more restrictive hypothetical question.  Therefore,

13  the Court finds that, while the ALJ may have asked an unclear

14  question, Plaintiff's subsequent questioning clarified the ALJ's

15  hypothetical question.  Therefore, the ALJ could reasonably rely

16  on Ms. Guillory's subsequent answers.

17               **B.  Systemic Lupus Erythematosus.**

18      In positing Plaintiff's residual functional capacity to Ms.

19  Guillory, the ALJ excluded Plaintiff's lupus claim while including

20  her photosensitivity.  The ALJ did this because

21        Dr. Chen notes a diagnosis of possible lupus, but
         that diagnosis is not clinically confirmed.  In fact,

22        Dr. Pincus, a rheumatologist, specializing in the
         treatment of conditions such as lupus, opined that

23        the claimant had only mild lupus, at most, but did
         note definitively diagnose the claimant with that

24        condition.  Regardless, Dr. Pincus indicated that the
         claimant had had an excellent response to treatment

25        with her medications, including Voltaren.
         . . .

26        I also note that the treatment records reflect only
         intermittent reports of the claimant's purported

27        symptomology with sporadic conservative treatment and
         inconsistent laboratory findings.  No physician of

28        record has opined . . . that the claimant's
         impairments are more limiting than found by the
         undersigned [Administrative] Law Judge.

1    (R. at 17, 20.)

2         Plaintiff argues that the ALJ erred by "determining

3    Plaintiff's lupus was not a severe impairment." (Pl.'s Mem. Supp.

4    Summ. J. 17.)  Plaintiff appears to argue that Plaintiff has lupus

5    because photosensitivity is a symptom of lupus and is not related

6    to Plaintiff's shoulder impairment. Id. at 17:17-20.  She then

7    argues that her lupus is a severe impairment because doctors and

8    Ms. Guillory have opined that her photosensitivity prevents

9    outdoor work. Id.  Defendant seemingly accepts that Plaintiff has

10   lupus but argues Plaintiff failed to establish that her

11   photosensitivity significantly limited her ability to perform

12   basic work activities, such as walking, sitting, and lifting, and

13   thus does not qualify as a severe impairment. (Mem. Points

14   Authorities Supp. Def.'s Cross-Mot. 15:18-27.)  This Court does

15   not have to reach Defendant's severity argument since substantial

16   evidence supports the ALJ's finding that Plaintiff does not have

17   lupus.

18        Since the record contains factors that simultaneously

19   support and refute Plaintiff's lupus claim, it is solely within

20   the province of the ALJ to resolve the conflict. Sample v.

21   Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The first set of

22   factors in support of Plaintiff's lupus claim include three

23   positive ANA tests (R. at 133-135, 227, 243), one episode of skin

24   rashes (R. at 146, 143), and photosensitivity.[8]  However, the

25   record also contains one negative ANA test. (R. at 130-31.)  While

26   this evidence lends support to Plaintiff's lupus claim, the most

27

28        [8]  Photosensitivity is "[s]ensitivity to light either because of an
     autoimmune illness, such as systemic lupus erythematosus, or because of the use
     of application of sensitizing drugs or chemicals." Taber's Cyclopedic Medical
     Dictionary  supra note 1 at 1651-52.

significant factor weighing against Plaintiff's claim is the noticeable lack of any definitive lupus diagnosis.  Of the 13 physicians who saw Plaintiff, none positively diagnosed Plaintiff with lupus and only three opined about the presence of lupus.  Of these latter physicians, one unequivocally stated Plaintiff did not have lupus (R. at 249) while two cautiously opined Plaintiff *may* have lupus (R. at 133-35, 201-02).

Dr. Pincus was the first doctor to suggest plaintiff may have lupus.  Based on Plaintiff's "rash, leukopenia, ultraviolet sensitivity and arthralgia," Dr. Pincus made a cautious diagnosis of "systemic lupus erythematosis [sic] of a mild variety." (R. at 135 (emphasis added).)  Dr. Pincus noted that this was not a definitive diagnosis.  Specifically he wrote: "I *suggest* that the patient *possibly* has systemic lupus . . . At least this diagnosis is a working diagnosis and should be the first considered given the findings so outlined." Id.  (emphasis added).  In concluding his report, Dr. Pincus further wrote: "In conclusion, I feel the *most likely* diagnosis, *but not definite*, is systemic lupus erythematosis [sic] of a mild nature." Id. (emphasis added).  Dr. Pincus also noted that Plaintiff had reacted positively to the medication Voltaren: "Her response to [Voltaren][9] was excellent *with almost complete resolution* of her discomfort."  Id.  No other physician made a reference to lupus from 1990 to August 29, 2003, when Dr. Chen saw Plaintiff.

On August 29, 2003, Dr. Chen stated Plaintiff had "*possible* lupus." (R. at 202 (emphasis added).)  Dr. Chen made this diagnosis only once despite having seen Plaintiff a total of 8

---

[9] See supra note 1.

times.[10]  Dr. Pincus's and Dr. Chen's diagnoses stand in contrast to Dr. Lin's diagnosis.

Dr. Lin opined that plaintiff did not have lupus.  In doing so, he provided the reasoning behind his conclusion:

> Claimant...[had] two mildly positive ANA tests in the past.  *The claimant does not have any other signs or symptoms that would suggest she has lupus.  The ANA is not specific for lupus and the test in only mildly positive in the claimant's case.*  She states she has had intermittent negative ANA tests in the past.

(R. at 249 (emphasis added).)

Ultimately the record contains one opinion that Plaintiff does not have lupus, two cautious opinions that Plaintiff may have lupus, and no definitive diagnosis that Plaintiff has lupus.  The present case is not one in which the ALJ ignored a conclusive diagnosis.  See, e.g., Petersen v. Barnhart, 2006 U.S. App. LEXIS 31627 (9th Cir. 2006) ("Dr. Wambaugh diagnosed Petersen as having had multiple sclerosis ('MS') since at least 1991.  The ALJ failed to credit Dr. Wambaugh's diagnosis by concluding that Petersen had only 'possible multiple sclerosis.'").  Here, Plaintiff only as "possible lupus," at the very best.

Based on a review of the record, the ALJ's decision to discount Plaintiff's lupus claim is supported by substantial evidence.  Hence, the ALJ did not err by excluding lupus from his disability determination.

### C.  Plaintiff's Subjective Pain and Symptoms.

During the administrative hearing, Plaintiff reported severe pain and other symptoms in addition to her medically

---

[10]  Dr. Chen also took clinical notes on the same day she completed Plaintiff's Physical Capacity Assessment form. (R. at 147.)  While Dr. Chen noted that Plaintiff had a "[history] of 'mild lupus,'" her notes do not contain a specific diagnosis. Id.  Rather, "possible lupus" only appears on Plaintiff's Physical Capacity Evaluation form. (R. at 202.)

confirmed shoulder impairment and limitations.   Specifically,

Plaintiff testified:

> Well, I have problems with everything [INAUDIBLE] I
> mean I just have a lot of pain in my arms, in my
> shoulders, in my knees.  I can't support -- seem to
> support my weight.  I can't hold a book up.  I can't
> type without my fingers cramping.  I have to lay
> down.  I mean, I just have to rest every -- all the
> time.  I just have to -- I start something and it's
> within minutes that I can't continue.

[R. at 294 (alteration in original)]  Plaintiff also testified

that she could not lift more than 5 pounds because her arms "give

in" on her (R. at 298), and spends most of her day lying down and

resting (R. at 300).[11]  As discussed below, the ALJ must credit

this testimony if the record contains objective medical evidence

supporting it.

To properly reject a claimant's subjective pain claim, "an

ALJ must make specific findings justifying that decision." Fair v.

Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  However, the initial

burden is on the claimant: "(1) she must produce objective medical

evidence of an impairment or impairments; and (2) she must show

that the impairment or combination of impairments could reasonably

be expected to (not that it did in fact) produce some degree of

symptom." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996)

(emphasis in original); Cotton v. Bowen, 799 F.2d 1403, 1407-08

(9th Cir. 1986).  "This is a threshold requirement that cannot be

overlooked." Fair, 885 F.2d at 602 n.1.

A review of the record reveals that Plaintiff's only

diagnosed impairment was her right shoulder impairment.   Thus,

---

[11] Contrary to Plaintiff's testimony of near-incapacitation, Plaintiff also testified that she attends at least one community college class per day (R. at 281), sometimes drives a 1979 Chevrolet pickup truck (R. at 275-76), helps her mother with household chores (R. at 297), and works as an usher at the Palomar College theater, (R. at 262-63).

Plaintiff's only diagnosed impairment precluded performance of above-shoulder work but cannot reasonably be expected to cause Plaintiff to experience the ailments she described in her testimony.  While it appears that Plaintiff periodically displayed symptoms of lupus, no doctor ever diagnosed her with lupus.  Since physicians are in the best position to make such diagnoses, an ALJ should not be expected to make a diagnosis himself if a claimant's own physicians do not.

Since the record does not contain objective medical evidence suggesting the *existence* of pain, the ALJ may disregard the testimony after making specific findings to explain his decision. Bunnell v. Sullivan, 912 F.2d 1149, 1154 (9th Cir. 1990); Bates v. Sullivan, 849 F.2d 1059, 1072 (9th Cir. 1990).  In the present case, the ALJ set forth several reasons for rejecting Plaintiff's subjective complaints of pain and related symptoms. (R. at 21.)  The ALJ explained:

> Although she alleges carpal tunnel symptoms, electrodiagnostic testing on May 15, 2002 and June 29, 2004 was negative.  Although the claimant argued that her difficulties with sitting, use of her arms and hands, and stamina, would preclude work on a regular and continuing basis, the limited medical findings of record do not reflect ongoing signs of symptoms consistent with the claimant's allegations.  Indeed, the claimant's medication, Voltaren, Tylenol, and aspirin control her symptoms without disabling side effects.  Moreover, the claimant is currently attending Palomar College, where she works part time, three days per week.
>    . . . The claimant's predominant treatment was for her recurring right shoulder dislocation, which condition was under control and managed conservatively.  I also note that treatment records reflect only intermittent reports of the claimant's purported symptomology with sporadic conservative treatment and inconsistent laboratory findings. . . .  No physician of record has opined, as regards any continuous period of note less than 12 months, that the claimant's impairments are more limiting than found by the undersigned [Administrative] Law Judge.

(R at 19-20.)

The ALJ's reasons are persuasive and not contradicted by the record.  Ultimately, the record contains substantial evidence of only one impairment: right shoulder instability.  Since the record does not contain substantial evidence of other ailments and proper reasons for rejecting Plaintiff's subjective pain and symptoms were set forth, the ALJ's decision to disregard Plaintiff's subjective testimony was not in error.

### D.  Treating Physicians' Opinions.

In denying Plaintiff's claim, the ALJ also discounted the opinions of Plaintiff's treating physicians: Dr. Chen and Dr. Birchall.  The ALJ rejected Dr. Chen's views, as expressed in the Physical Capacity Assessment form, because "[the] opinion is conclusory, is set forth on a checklist form supplied by counsel, and provides no supporting objective medical data consistent therewith." (R. at 17.)  Similarly, the ALJ discounted Dr. Birchall's opinion that Plaintiff could work between 6 and 8 hours because "[n]o opinion is set forth regarding duration, nor are there longitudinal objective medical records in support of the opinion rendered." (R. at 19.)

Initially, Plaintiff argues that the opinions of Drs. Chen and Birchall should not have been discounted based on the doctors' status as Plaintiff's treating physicians. (Pl.'s Mem. Supp. Summ. J. 19:5-22:11.) However, nothing in the record suggests that the ALJ ever doubted Dr. Chen or Dr. Birchall's designations as treating physicians.  Plaintiff then argues that the ALJ failed to discuss conflicting medical evidence or give convincing reasons for rejecting the doctors' opinions. (Pl.'s Mem. Supp. Summ. J. 22:12-24:15)  Plaintiff also questions the ALJ's rejection of the

1   Physical Capacity Assessment form and argues that other forms the

2   ALJ accepted were also checklist forms. (Pl.'s Mem. Supp. Summ. J.

3   21:5-20.)  Defendant responds that the ALJ properly discounted

4   these treating physicians' opinions and gave clear and convincing

5   reasons for doing so. (Mem. Points Authorities Supp. Def.'s Cross-

6   Mot. 16:6-18:5.)

7       The opinions of treating physicians carry substantial weight

8   in the disability determination.  <u>Magallanes v. Bowen</u>, 881 F.2d

9   747, 751 (9th Cir. 1989).  "The treating physician's opinion is

10  not, however, necessarily conclusive as to either a physical

11  condition or the ultimate issue of disability." <u>Id.</u>  "The ALJ may

12  disregard the treating physician's opinion whether or not that

13  opinion is contradicted." <u>Id.</u>  To ignore a treating physician's

14  opinion, the ALJ must provide "specific, legitimate reasons for

15  doing so that are based on substantial evidence in the record."

16  <u>Murray v. Heckler</u>, 722 F.2d 499, 502 (9th Cir. 1983).  For

17  example, an ALJ may disregard an opinion because it is "brief and

18  conclusory in form with little in the way of clinical finding to

19  support [it's] conclusion . . ." <u>Id.</u> (quoting <u>Young v. Heckler</u>,

20  803 F.2d 963, 968 (9th Cir. 1986) (alteration in original).

21  Finally, if the ALJ ignores *uncontroverted* medical evidence, he

22  must provide clear and convincing reasons to support his decision.

23  <u>Magallanes</u>, 881 F.2d at 751.  If the ALJ ignores controverted

24  opinions, he must provide specific, legitimate reasons for doing

25  so. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1203 (9th Cir. 2001).

26      (i) Dr. Chen's Opinions.

27      Based on the record, Dr. Chen's assessment as a whole cannot

28

23                              05CV2251

be categorized as either consistent or inconsistent with the
record because some elements of her opinion are consistent with
the record while others are not.  For example, Dr. Chen opined,
and other physicians agreed, that Plaintiff could sit for 6 hours
at one time and for 6 hours in an 8-hour day; Plaintiff could also
lift and carry 0-10 pounds continuously and 21-25 pounds
occasionally. (R. at 201.)  However, Dr. Chen's opinion that
Plaintiff could stand and walk for 4 hours at one time and for 4
hours during and 8-hour day was inconsistent with Dr. Haaland's
opinion that Plaintiff could do both for 6 hours. (R. at 190.)
Dr. Chen also set forth opinions that are neither consistent nor
inconsistent with the record because she was the only physician to
opine about the subject.  For example, Dr. Chen opined that
Plaintiff could not "sustain capacity to perform work at a
consistent pace for 8 hours," could not work "without needing more
than one 5 minute break per hour," could not "complete a normal
workday without interruptions from physical symptoms," and would
miss 3-4 days of work per month. (R. at 202.)  No other doctor
reached the same conclusions, as those doctors had not been asked
the specific questions contained in the form Plaintiff provided to
Dr. Chen.

     However, Dr. Chen's opinion is in conflict with opinions
elsewhere in the record based on Ms. Guillory's opinion that
Plaintiff could not work if the assumptions in the ALJ's second
hypothetical were true.  These assumptions were based entirely on
Dr. Chen's opinions as set forth in the Physical Capacity
Assessment form. (See R. at 309.)  In this sense, Dr. Chen's

opinions are controverted.  Nonetheless, because the opinion itself contains a mixture of consistent and inconsistent opinions, the Court evaluates the ALJ's rejection of Dr. Chen's opinion under the more stringent "clear and convincing reasons" standard. Even under this standard, the ALJ's three stated reasons for disregarding Dr. Chen's opinion are persuasive.

First, substantial evidence from the record supports the ALJ's determination that Dr. Chen's opinions lack a basis in objective medical evidence.  Of the 11 times Dr. Chen saw Plaintiff, including 2 referrals to other doctors, Plaintiff's complaints consisted of: urinary tract infections (R. at 159, 168), pain in various parts of her body (R. at 171, 172, 180), weakness and tiredness (R. at 146, 218), and a rash (R. at 146). However, as the ALJ notes, Dr. Chen's treatment regimen remained conservative.  For example, Dr. Chen recommended that Plaintiff engage in "aerobic exercise [and] mod[erate] activity" (R. at 171), "[t]old [Plaintiff] to do stretching and aerobic exercise," (R. at 218), and prescribed physical therapy (R. at 235). Finally, Dr. Chen never definitively diagnosed Plaintiff with any ailment besides right shoulder instability, despite her history with Plaintiff and one positive ANA test.  Dr. Chen even opined that Plaintiff would have to do "very low impact work" if her shoulder injury did not improve. (R. at 110, 150.)  Therefore, the record supports the ALJ's first stated reason for rejecting Dr. Chen's opinion.

The ALJ's final two reasons for rejecting Dr. Chen's opinion are interrelated. The ALJ correctly states that the opinions on

the checklist form are conclusory because Dr. Chen provided no explanation for any of the conclusions on the form or anywhere else in the record.  Additionally, Dr. Chen's entries on the checklist form itself are invalid because Dr. Chen's own medical records do not provide an objective basis for those entries.

Checklist forms and conclusory statements are not *per se* invalid.  Because Dr. Chen had a treatment relationship with Plaintiff, a conclusory checklist form may be valid if her medical records provide support for opinions expressed on the form.  See, e.g., Batson v. Comm'r of the SSA, 359 F.3d 1190, 1195 n.3 (9th Cir. 2004) ("The dissent contends . . . that it is wrong to view one of [the doctor's] reports, in isolation, as a checklist.  We respectfully disagree.  [*The doctor's*] *treatment notes do not provide objective medical evidence of the limitations asserted in his report* . . .") (emphasis added).  Hence while a checklist that does not explain its conclusions *is per se* invalid if a non-treating physician completes it, the same cannot be said when a claimant's treating physician completes the same form.

In the present case, like Batson, while Dr. Chen is Plaintiff's treating physician, her opinions are conclusory and not supported by her own medical records.  Therefore, based on a review of the record and the preceding analysis, the Court finds that the ALJ provided clear and convincing reasons for rejecting Dr. Chen's opinion.

(ii) Dr. Birchall's opinion.

It would seem that an opinion affirming the Plaintiff's

ability to work up to and including 8 hours per day would support the ALJ's ultimate decision.  However, the ALJ discounted Dr. Birchall's opinion because it lacked a basis in objective medical evidence.  The ALJ's reasoning is persuasive.  Dr. Birchall could not reasonably opine that Plaintiff could work 6, 7, or 8 hours if his medical records do not support that opinion.  Dr. Birchall's records reveal that he was unclear about the cause of Plaintiff's complaints. (R. at 240-41.)  However, despite Dr. Birchall's writing that the "etiology remains unclear" for Plaintiff's pain and further evaluation was needed, he simultaneously issued an opinion about Plaintiff's work limitations. (R. at 241.)  However, he did not explain why he believed Plaintiff could work between 6 and 8 hours.  Hence, the opinion was conclusory.  Furthermore, because of the uncertainty in Dr. Birchall's records, *any* opinions about work limitations--even if they support the ALJ's conclusions--are unsupportable.  Therefore, the ALJ did not err in discounting the Dr. Birchall's opinion.

In sum, both Dr. Birchall and Dr. Chen issued conclusory opinions that lacked sufficient objective medical support.  The ALJ also included these doctors' findings in his decision before discounting them and explained why he discounted them. (R. at 16-20.)  Therefore, based on a review of the record and the preceding analysis, the Court finds that the ALJ did not err in discounting Dr. Chen and Dr. Birchall's opinions.  Furthermore, since Dr. Chen's opinion was the basis for the ALJ's second hypothetical question, the Court also finds that the ALJ did not err in

05CV2251

1   ignoring Ms. Guillory's response to that question.

2   **E.   Development of the Record and Plaintiff's Past Job Duties.**

3       Plaintiff argues that Defendant failed to sufficiently

4   develop the record by not fully exploring the duties of her past

5   relevant work and resolving a conflict between the Dictionary of

6   Occupational Titles' (DOT) description of Plaintiff's jobs and her

7   jobs as actually performed. (Pl.'s Mem. Supp. Summ. J. 9:15-

8   11:17.)   Additionally Plaintiff argues that her cashier position

9   does not qualify as substantial gainful activity (SGA) because her

10  income failed to meet minimum SGA requirements. (Pl.'s Mem. Supp.

11  Summ. J. 13:23-14:4.)   Defendant responds that the ALJ

12  sufficiently developed the record and did not have a duty to

13  resolve any conflict because none was apparent. (Mem. Points

14  Authorities Supp. Def.'s Cross-Mot. 12:26-13:11.)   Defendant also

15  argues that income requirements are not determinative of a job's

16  SGA status and the cashier position qualifies as SGA since

17  Plaintiff was able to consistently work in that capacity. (Mem.

18  Points Authorities Supp. Def.'s Cross-Mot. 13:12-25.)

19      An ALJ has the "duty to fully and fairly develop the record

20  and to assure that the claimant's interests are considered." Brown

21  v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983).   A claimant is not

22  considered disabled if she can perform a job either as she

23  actually performed it or as it is generally performed. S.S.R. 82-

24  61.   In the present case, the ALJ ended the disability

25  determination in step four when he determined:

26      7. The claimant's past relevant work experience as a
            cashier or secretary did not require the performance of
27          work-related activities precluded by the above

28

                                  28                    05CV2251

                    limitation(s).
              8. The claimant's impairment does not prevent the
               claimant from performing her past relevant work.

[R. at 21 (emphasis added)]

     The ALJ's decision does not specify whether he believed
Plaintiff could perform her past relevant work as actually
performed or as generally performed.  Therefore, the court
evaluates each job under both standards to see whether substantial
evidence supports the ALJ's determination.

(1) Cashier as actually performed.

     (i) Cashier position qualifies as SGA.

     Plaintiff's contention that her cashier position does not
qualify as SGA is unpersuasive.  Plaintiff selectively directs the
court to the 2001 calendar year, in which she made an average of
$350.19 per month, and notes her average income that year was
below the suggested threshold of $700. (Pl.'s Mem. Supp. Summ. J.
13:23-14:4.); see 20 C.F.R. § 404.1547(b)(2)(ii) (explaining the
method of calculating income standards).  Plaintiff's reliance on
this income factor is misplaced.  The Code of Federal Regulations
state: "Generally, if you worked for substantial earnings, we will
find that you are able to do substantial gainful activity.
However, the fact that your earnings were not substantial will not
necessarily show that you are not able to do substantial gainful
activity." 20 C.F.R. § 404.1574(a)(1).  The record also reveals
that Plaintiff did meet the average income recommendations under
Section 404.1574.

     Plaintiff testified that she worked as a cashier in 1998. (R.

at 270.)  This corresponds with the position Plaintiff described in her Work History Report. (R. at 67.)  Plaintiff earned $8,027.54 in 1998 – an average of $668.96 per month. (R. at 50.)  Plaintiff's average income is above the $500 guideline for 1998.  20 C.F.R. § 404.1574(b)(2)(ii).  As the guidelines indicate, the fulfillment of this factor alone suggests Plaintiff engaged in substantial gainful activity in 1998. 20 C.F.R. § 404.1574(b)(2).  Plaintiff's reliance on the 2001 income is misplaced since Plaintiff's 1998 income satisfied Section 404.1574.  Therefore, the ALJ properly considered Plaintiff's 1998 cashier position. 20 C.F.R. 404.1560(b)(1) ("Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for your to learn it.").

(ii) ALJ did not err.

Plaintiff argues that the ALJ failed to adequately develop the record by not inquiring into Plaintiff's cashier duties. (Pl.'s Mem. Supp. Summ. J. 9:24-10:14.)  The ALJ may determine the nature of Plaintiff's past job duties from one of two acceptable sources: "a properly completed vocational report, SSR 82-61, and the claimant's own testimony, SSR 82-41." Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001).

Plaintiff completed a vocational report in which she describes her cashier duties: "Cash register operations Completing of balance sheet at end of shift." (R. at 67.)  She further listed the position's lifting and carrying requirements: "occasionally it would require stocking inventory + preparing displays, that

05CV2251

required lite [sic] lifting." <u>Id.</u>  The ALJ did not question Plaintiff about any additional duties during the administrative hearings.  However, unlike Plaintiff's secretary position, <u>see</u> discussion <u>infra</u> Part IV.E.1., the record does not indicate that Plaintiff's cashier position involved duties not generally associated with the position.

Having reviewed the "vocational statement of record," Ms. Guillory testified that "[t]he position of cashier is classified as light work, semi-skilled, *actually and customarily performed are consistent*." (R. at 307.)  Furthermore, when Plaintiff posited the more restrictive limitation discussed in Part IV.A, Ms. Guillory responded: "The cashier position, the one she was actually performing, would be fine, because -- *as she described it*.  It would be fine as actually performed." [R. at 310 (emphasis added)]

Although the ALJ did not question Plaintiff about her cashier job, the vocational report provided an independent source upon which the ALJ could rely.  The vocational report also provided Ms. Guillory with information with which she opined whether Plaintiff could perform her cashier position as actually performed.  Ms. Guillory's testimony indicates that she indeed considered Plaintiff's description of her duties.  <u>Id.</u>  Thus, the record demonstrates that the ALJ did not err and fully developed the record with regard to plaintiff's cashier job as actually performed.  The ALJ did not err because the he reasonably found that Plaintiff could perform her cashier job as actually performed

1   and it is not necessary to analyze this position as generally

2   performed.

3   (2) Secretary as actually performed.

4        Plaintiff's secretary position as actually performed is

5   governed by the same analysis as her cashier position. See

6   discussion supra Part IV.E.1.ii.  When the Court evaluates the

7   secretary position under that standard, the Court finds that the

8   ALJ erred in finding Plaintiff could return to her secretary

9   position as actually performed.

10       First, Plaintiff omitted the secretary position as she

11  completed her vocational report. (See R. at 61-68.)  Therefore,

12  this form is of no use in evaluating her past secretarial work

13  duties.  The only other available source is Plaintiff's own

14

15  testimony.

16       Plaintiff's testimony relating to her secretarial duties

17  appears on pages 265 and 269 of the record.  The extent of the

18  ALJ's questioning was limited to asking whether she was a

19  "clerical secretary for a chiropractor" and "primarily . . . did

20  secretarial work. (R. at 265, 269.)  "Secretarial work" is a broad

21  occupational description with varying duties.  Plaintiff did not

22  explain what her actual duties were.  The ALJ did not ask what

23  Plaintiff's duties were.  Therefore Plaintiff's testimony does not

24  provided evidence upon which the ALJ could rely to determine

25  whether she could still perform her secretary job as actually

26  performed.  However, this error is harmless if the ALJ reasonably

27  concluded that Plaintiff could perform her secretary job as

28

generally performed.

(3) Secretary job as generally performed

In response to the ALJ's question, Plaintiff testified that her past position was primarily secretarial. (R. at 269.) However, Plaintiff also mentioned that her secretary position may have included duties above and beyond a purely secretarial position. (See R. at 268 ("I worked -- see, I was a medical assistant. That's why I stayed for approximately 10 years.").)  Despite hearing the Plaintiff mention this, the ALJ failed to inquire into the nature of any duties Plaintiff may have performed as a medical secretary.

Without conducting this inquiry, and with no other evidence to judge Plaintiff's duties, the ALJ asked Ms. Guillory to assess the position's skill and extertional demands. (R. at 307.)  Ms. Guillory testified that the secretary position was classified as "sedentary skilled work" and "as actually and generally performed appear[ed] to be consistent." Id. (emphasis added).  It is unclear upon what Ms. Guillory based this opinion, especially since Plaintiff testified that her secretary position may have involved unspecified medical tasks.  Indeed, the record does not provide any evidence upon which Ms. Guillory could have based her opinion that the secretary position as actually performed was consistent with the position as generally performed.  Consequently, the ALJ failed to develop the record with respect to Plaintiff's secretary work to provide the basis for Ms. Guillory's determination that the position as actually performed was consistent with the

1   position as generally performed.

2       Ultimately, since the ALJ erred in developing the record and

3   had an insufficient basis to assess the secretary position, he

4   could not have reasonably found that Plaintiff could return to

5   perform the secretary job, either as actually performed and as

6   generally performed.

7   (3) Harmless error

8       Since the ALJ erred, the court must determine whether the

9   error requires remand.  In the Social Security context, one

10  situation in which an ALJ commits harmless error is "where the

11  mistake was nonprejudical to the claimant or irrelevant to the

12  ALJ's ultimate disability conclusion." Stout v. Comm'r, SSA, 454

13  F.3d 1050, 1054 (9th Cir. 2006).  Here, while the ALJ erred by not

14  developing the record with respect to Plaintiff's secretarial

15  duties, his error was harmless because he properly found Plaintiff

16  could perform her past cashier job.

17

18      While the record does not support the ALJ's determination

19  that Plaintiff could work as a secretary, substantial evidence

20  supports the ALJ's decision that Plaintiff could work as a

21  cashier.  This is true whether the ALJ determined Plaintiff could

22  perform the cashier position as either actually performed or

23  generally performed.  Ultimately, Plaintiff can still perform at

24  least one of her past relevant jobs.  Thus, Plaintiff was not

25  prejudiced by the ALJ's error.  Nothing would be gained by

26  remanding this case to determine whether Plaintiff could actually

27  perform the secretary position in addition to the cashier

28

position.

(4) Duty to resolve conflict

Finally, Plaintiff argues that the ALJ failed to determine whether there was a conflict between Plaintiff's actual past work duties and the description of her jobs in the Dictionary of Occupational Titles (DOT). (Pl.'s Mem. Supp. Summ. J. 10:19-13:22.)  Plaintiff reads the Social Security Rulings as imposing an affirmative duty on the ALJ to ask about any discrepancies, whether or not any are apparent. Id.  Defendant indicates that Plaintiff does not state whether such a discrepancy actually exists and argues that the ALJ has a duty to investigate description discrepancies only where they exist. (Mem. Points Authorities Supp. Def.'s Cross-Mot. 12:26-13:11.)

   The Social Security Rulings state, in pertinent part:

> Occupational evidence provided by a VE . . . generally
> should be consistent with the occupational information
> supplied by the DOT. When there is an apparent
> unresolved conflict between VE . . . evidence and the
> DOT, the adjudicator must elicit a reasonable
> explanation for the conflict before relying on the VE
> . . . evidence to support a determination or decision
> about whether the claimant is disabled. At the hearings
> level, as part of the adjudicator's duty to fully
> develop the record, the adjudicator will inquire, on the
> record, as to whether or not there is such consistency.

S.S.R. 00-4p.  In the present case, the ALJ asked Ms. Guillory to "assess for us the skill level and exertional level of the Claimant's past work." (R. at 307.)  Ms. Guillory responded to the ALJ's inquiry, identified the skill and exertional levels of each relevant job, and testified that each was consistent. Specifically, Ms. Guillory testified that "[t]he position of

cashier is classified as light work, semi-skilled, actually and customarily performed are consistent." <u>Id.</u>  Though the ALJ did not explicitly ask Ms. Guillory whether there was a conflict, his questioning clearly satisfied S.S.R. 00-4p. <u>See</u> S.S.R. 00-4p (providing "Exertional level" and "Skill Level" as examples of the consistency inquiry).

Furthermore, since Ms. Guillory stated there was no conflict, the ALJ was under no obligation to "elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." S.S.R. 00-4p. Therefore, the court finds that the ALJ satisfied his duty under S.S.R. 00-4p and, because the descriptions were consistent, was under no obligation to further examine the issue.

## V.  CONCLUSION

After reviewing the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion, the Court finds that the ALJ provided specific, legitimate reasons for his conclusion.  In addition, substantial evidence exists to support the ALJ's findings. Therefore, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED**, and Defendant's Cross Motion for Summary Judgment be **GRANTED**.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than <u>March 8, 2007</u>, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>March 15, 2007</u>. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 22, 2007

_____
Hon. Leo S. Papas
U.S. Magistrate Judge