# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOELLA G. SCHNELL,<br><br>                    Plaintiff,<br>vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of the Social Security Administration,<br><br>                    Defendant. | Civil No.   05 CV 2251- BEN (LSP)<br><br>ORDER ADOPTING REPORT AND RECOMMENDATION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Docket Nos. 10-11] |

     Plaintiff Noella Schnell seeks judicial review of the Commissioner's decision to deny disability insurance benefits under Titles II and XVI of the Social Security Act (Act). Cross motions have been filed. The Honorable Leo S. Papas has issued a Report and Recommendation (Report), recommending Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross-motion for summary judgment be **GRANTED**. Specifically, Judge Papas found the Commissioner's decision was supported by substantial evidence. Timely objections were filed on March 8, 2007, by the Plaintiff. No reply was filed by the Defendant.

     The Court's role in reviewing the Report is set forth in 28 U.S.C. § 636(b)(1). Under this statute, the Court "shall make a *de novo* determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." *Id. See also*, *U.S. v. Reyna-Tapia*, 328 F.3d 1114,

1 1121 (9th Cir. 2003) ("The statute makes it clear that the district judge must review the magistrate
2 judge's findings and recommendations *de novo* if objection is made, but not otherwise. Neither the
3 Constitution nor the statute requires a district judge to review, *de novo*, findings and recommendations
4 that the parties themselves accept as correct."). Notwithstanding, the Court has made a *de novo*
5 review of the entire Report, and agrees with Judge Papas' reasoning and conclusions as set forth in
6 the Report. *See* 28 U.S.C. § 636(b).

### I.  FACTUAL BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

10 Plaintiff, born on December 21, 1963, was 41 years old at the time of the hearing before the
11 Administrative Law Judge (ALJ). (R. at 15.) Plaintiff, who is unmarried, has completed
12 approximately 13 years of education and lives with her parents. (R. at 15, 297, 301.) Plaintiff's
13 relevant work experience includes approximately 10 years of secretarial work, approximately one year
14 of grocery cashier work, and 17 months of parking lot attendant work. (R. at 61-67, 95, 98.)

15 Plaintiff has also worked as a Salvation Army "bell ringer," a cosmetologist, and an usher at
16 the Palomar College theater. *Id.* The ALJ, however, did not take these three jobs into account as they
17 were performed for short periods of time and did not qualify as substantial gainful activities (SGA).
18 *See* 20 C.F.R. 404.1572-1573 (defining SGA).

19 Plaintiff was also a student at Palomar College where she was enrolled in theater and
20 automotive repair courses. (R. at 262-63.) Plaintiff attended Palomar College since at least 2003
21 where she was able to carry 9 unit class loads. (R. at 273-74.) In addition to her classes, the Plaintiff
22 also worked as an usher in the college theater for approximately three hours per week. (R. at 262-63.)

#### A.  Plaintiff's Related Medical History

25 In 1979, Plaintiff was involved in a skiing accident where she sustained right shoulder injuries
26 that have never healed properly. (R. at 180-83.) Plaintiff continues to have recurring problems with
27 periodic right shoulder dislocation and has been diagnosed with "right shoulder instability." (R. at
28 180-81, 183, 186.) The Plaintiff's treating and examining physicians unanimously agree that use of

her right shoulder is limited to below the shoulder area. (R. at 110, 186, 192, 198, 253.)

In addition to her shoulder injury, Plaintiff has complained of, *inter alia*, photosensitivity, urinary tract infections, generalized body aches, abdominal pain, joint pain, generalized numbness, fatigue, and rashes. (R. at 128, 119, 146, 168, 183-86, 241.) Plaintiff also has a history of positive and negative Antinuclear Antibodies (ANA)[1] tests that are indicative of several diseases such as systemic lupus erythematosus (lupus or SLE)[2]. (R. at 130-31, 133-35, 227, 243.) However, despite Plaintiff's complaints and numerous medical evaluations by multiple physicians, Plaintiff has not been positively diagnosed with any ailment beyond the right shoulder injury.

The medical evidence in the record starts in 1990, when Dr. William Pincus saw Plaintiff on a referral from Dr. Lawrence Schnell. (R. at 133-35.) Dr. Pincus made a possible diagnosis of "systemic lupus erythematosis [sic] of a mild variety." (R. at 135.) However, Dr. Pincus noted that, while this was the most likely diagnosis, it was not a definitive one. *Id*. Dr. Pincus also noted that Plaintiff reacted positively to the medication Voltaren[3]: "Her response to [Voltaren] was excellent with almost complete resolution of her discomfort." *Id*. After this visit, the record does not contain another medical visit until 1992. At that time, Dr. Kaplan ordered a blood test that ultimately revealed negative ANA results. (R. at 130-31.)

---

[1] A positive ANA test is indicative of various diseases, can be drug-induced, or even appear in normal persons. Antinuclear antibodies are
> [a] group of antibodies that react against normal components of the cell nucleus. These antibodies are present in a *variety* of immunological diseases, including systemic lupus erythematosus, progressive systemic sclorosis, Sjogren's syndrome, scleroderma, polymyositis, and dermatomyositis, and in some persons taking hydralazine, procainamide, or isoniazid. *In addition, ANA is present in some normal individuals*.

*Taber's Cyclopedic Dictionary* 138-39 (19th ed. 2001) (emphasis added).

[2] SLE is "[a] chronic autoimmune inflammatory disease involving multiple organ systems and marked by periodic acute episodes." *Id*. at 1264. One is diagnosed with SLE
> if four or more of the following criteria are present, either at one time or sequentially: 1. Butterfly rash; 2. raised, scaly discoid skin lesions; 3. antinuclear antibodies...; 4. immunological disorders including lupus erythematosus (LE) cells or other autoantibodies; 5. pleuritis or pericaditis; 6. hemolytic anemia, leukopenia..., lymphopenia..., or thrombocytopenia...; 7. oral or nasopharyngeal ulcers; 8. nonerosive arthritis; 9. psychosis or convulsions without clear cause; 10. photosensitivity skin rash; 11. proteinuria . . . .

*Id*.

[3] Voltaren is a "nonsteroidal anti-inflammatory drug" used for "relief of the signs and symptoms of osteoarthritis . . . . [and] rheumatoid arthritis." *Physicians' Desk Reference* 2307-08 (61st ed. 2007).

1    According to the record, Plaintiff did not see another physician until nine years later in 1998, when Dr. Birchall evaluated Plaintiff for complaints of generalized body aches with fevers and chills for 3 days. (R. at 128.) Dr. Birchall suspected an unspecified infection and prescribed Cipro. *Id.* Plaintiff's next medical visit was four years later.

    The bulk of Plaintiff's medical records commence in 2002, when at least 7 separate physicians examined Plaintiff. Plaintiff predominantly complained of urinary tract infections, abdominal pain, shoulder pain, and general joint pain. (R. at 114, 119, 159, 168, 172, 180.) Although Plaintiff reported to doctors that she presented and had been diagnosed with lupus, the medical record is dubiously void of any lupus-related symptoms or ANA tests for 2002.

    During this time, Plaintiff began seeing Dr. Chen, one of her treating physicians. On April 11, 2002, Dr. Chen first evaluated Plaintiff for joint pain; at which time, she declined to complete Plaintiff's disability forms. (R. at 172.) On April 22, 2002, Dr. Chen evaluated Plaintiff for similar complaints and advised Plaintiff to engage in aerobic exercise and moderate activity, to which the Plaintiff agreed. (R. at 171.) Dr. Chen next evaluated Plaintiff on September 6, 2002. (R. at 150.) Plaintiff complained of right shoulder pain and explained she was considering becoming an auto mechanic. *Id.* Dr. Chen, however, advised Plaintiff to avoid "mechanic work," and advised Plaintiff she would have to engage in low impact work if no treatment was available for her shoulder injury. *Id.* Plaintiff was then referred to Dr. Paul Milling for an orthopedic consultation. *Id.*

    Dr. Milling found Plaintiff had full range of motion in her right shoulder but noted her right shoulder was tender and she exhibited signs of apprehension. (R. at 180.) Dr. Milling also advised Plaintiff to consider additional shoulder surgery but cautioned there would be a decreased chance for success and likely loss of motion. *Id.* Dr. Milling offered no diagnosis or opinion regarding Plaintiff's work limitations. No further medical consultations or appointments occurred in 2002.

    On March 14, 2003, Dr. Thomas Dorsey completed an orthopedic consultation at the request of the Social Security Administration (SSA). (R. at 183-86.) Dr. Dorsey's examination revealed Plaintiff was in general good health with "grossly normal" range of motion in her shoulders, elbows, wrists, hips, knees, and ankles. (R. at 185.) After full examination, Dr. Dorsey diagnosed Plaintiff with "right shoulder instability." (R. at 186.) The examination also revealed two other abnormalities

besides Plaintiff's right shoulder injury: decreased sensation to the fingers of Plaintiff's right hand as compared to her left hand and decreased sensation in Plaintiff's right foot as compared to her left foot. (R. at 285.) Regarding Plaintiff's work limitations, Dr. Dorsey's concluded,

> The patient apparently is able to do some type of physical activities since the bilateral hands show grease on them today. She should be doing no overhead activities. Lifting and carrying to the level of the waist would be 20 pounds occasionally and 10 pounds frequently. There are no other limitations.

(R. at 186.) Shortly after Plaintiff's visit with Dr. Dorsey, the SSA requested that a state agency medical expert assess Plaintiff's physical residual functional capacity (RFC) [4].

The state agency medical expert, Dr. James Haaland, completed a consultative report for the SSA on March 27, 2003. (R. at 189-200.) Dr. Haaland found Plaintiff had the ability to lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk for about 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. (R. at 190.) Dr. Haaland also determined the Plaintiff could not perform work above the shoulder level with her right arm. (R. at 192.) Dr. Haaland also noted: "The [claimant] is credible [regarding] the alleged symptomology, but not its severity." (R. at 194.)

On July 28, 2003, Plaintiff returned to Dr. Chen, complaining of four months of fatigue, weakness, and tenderness in all her extremities. (R. at 146.) Dr. Chen noted Plaintiff had a fading rash on her chest, legs, and arms; and she ordered laboratory tests and prescribed over-the-counter allergy medication in response. *Id.* Plaintiff's test results indicated a positive ANA on August 15, 2003. (R. at 227.) Plaintiff returned to Dr. Chen on August 29, 2003, where Plaintiff's positive ANA test and her "[history] of 'mild lupus'" were noted. (R. at 147.) Interestingly, however, Dr. Chen did not diagnose Plaintiff with any specific ailment related to these findings, nor were any additional medications proscribed. *Id.* Nonetheless, Dr. Chen completed a "Physical Capacities Evaluation" form provided by Plaintiff. (R. at 201-02.)

Portions of the opinion Dr. Chen expressed on this form were consistent with those of other physicians while other portions were inconsistent. *See* discussion *infra* part IIIB. Moreover, in

---

[4] One's residual functional capacity is the most work a claimant can still perform despite his or her impairment(s) and limitations. 20 C.F.R. 404.1545.

response to questions on the form, Dr. Chen delivered opinions that no other doctor had expressed. The form contained fields for "Diagnosis," "Symptoms," and "Type of Treatment (i.e., medications)." (R. at 202.) Based on "generalized pain [and] weakness" symptoms, Dr. Chen diagnosed Plaintiff with "possible lupus" with a treatment of "diclofenac[5]." *Id.* Also, no mention of any right shoulder limitations are found in Dr. Chen's report. *Id.*

After the August 29, 2003, visit with Dr. Chen, the record contains 10 separate medical visits. [R. at 143, 214, 210, 209, 207, 204, 218, 235, 240, 241 (in date order).] Plaintiff presented with various complaints both related and unrelated to the present matter. Most notably, during a June 1, 2004, visit with Dr. Chen, Plaintiff complained of weakness, tiredness when curling her hair, and an overall feeling of being heavy. (R. at 218.) Dr. Chen recommended gentle stretching and aerobic exercise. *Id.* Plaintiff was also prescribed physical therapy 3 times per week for 4 weeks on a later date. (R. at 235.) During a subsequent visit to Dr. Birchall, Plaintiff was again prescribed Voltaren for pain. (R. at 241.) Dr. Birchall noted that the etiology of Plaintiff's pain "remain[ed] elusive" and opined Plaintiff could "work six to eight hours per day."[6] *Id.* Between August 29, 2003, to July 14, 2004, no doctor positively diagnosed Plaintiff with systemic lupus erythematosus (SLE) nor any other ailment not discussed.

### B.   Plaintiff's Administrative Hearing and Subsequent Medical Examination

An administrative hearing was held before Administrative Law Judge Samuel Durso on July 14, 2004. (R. at 260-313.) The Plaintiff testified on her own behalf and was represented by counsel.

A vocational expert, Connie Guillory, also testified at the hearing. (R. at 306-10.) The ALJ asked Ms. Guillory two hypothetical questions to determine whether Plaintiff could perform her past relevant work. The first hypothetical question was based on Plaintiff's residual functional capacity

---

[5] Diclofenac is a generic version of Voltaren. *Physicians' Desk Reference* 2307 (61st ed. 2007).

[6] The exact date of this visit is unclear. It is clear that the visit took place in July 2004, however, the "actual" day of the month is written illegibly, but appears to be either a 6, 12, or 16. (R. at 241.)

as described by Dr. Dorsey and Dr. Haaland.[7] (R. at 307-08.) Ms. Guillory opined that Plaintiff could return to her previous cashier and secretary jobs but not the parking lot attendant position. (R. at 308.) The second hypothetical was based solely on Dr. Chen's August 29, 2003, "Physical Capacities Evaluation" report.[8] (R. at 308-09.) Ms. Guillory responded the Plaintiff would not be able to work given the information provided in that hypothetical. (R. at 309.) Additional questioning regarding the first hypothetical was also posed by Plaintiff's counsel, which yielded consistent answers from Ms. Guillory.[9] *Id.*

Before the ALJ concluded the administrative hearing, the ALJ expressed doubts about Plaintiff's lupus claims and Dr. Chen's August 29, 2003, findings. (R. at 310-12.) Accordingly, the ALJ expressed the desire to further examine the lupus claim and ordered an "internist endocrinologist examination." (R. at 311.)

On September 11, 2004, Dr. Henry Lin, an internal medicine specialist, examined Plaintiff. (R. at 245-54.) Dr. Lin reviewed Plaintiff's medical records and took notice of her lupus complaint,

---

[7] The ALJ inquired,
[w]ell now, if I were to find the Claimant can hypothetically handle light work activity as defined by regulation that would be that she could sit, stand, and/or walk at least – or about six hours each in an eight-hour workday. She would need to avoid overhead controls, working -- may work above shoulder level with the right upper extremity; no ladders, ropes and scaffolds, but she could otherwise occasionally climb, balance, knell, stoop, crouch, crawl on an occasional basis. Environmentally, she should avoid concentrated exposure to sunlight. If I were to so find the Claimant to have that hypothetical capacity, in your vocational judgment, would she be able to return to any of her past jobs?
(R. at 307-08.)

[8] The ALJ inquired,
[n]ow, if I were to find that the Claimant could sit six hours, stand and/or walk four hours; she could occasionally lift up to 25 pounds as well as carry up to 25 pounds. She would be able to use her hands for simple grasping, pushing and puling and fine manipulation. She could use her feet for repetitive movements, pushing and pulling. She is able to reach frequently. She would occasionally be able to bend, squat, crawl, climb. She should not work outdoors. ... She would miss three to four days per month from work.
(R. at 308-09.)

[9] Ms. Guillory inquired,
I just have one question and that is, with the first hypothetical which I believe corresponds to Exhibit 5F [Record pages 189-200] -- but nevertheless, would the Claimant or the hypothetical person be able to perform the Claimant's past relevant work if her lifting and carrying were limited to the level of the waist for the 20 pounds occasionally and the level of the waist at 10 pounds frequently, so all her lifting and carrying would be at the waist level?
(R. at 309.)

the history of positive and negative tests, Plaintiff's history of shoulder injuries, and her complaints of general pain and weakness. (R. at 245-46.) Dr. Lin's physical examination revealed that Plaintiff was in general good health and had full range of motion in most of her extremities. (R. at 247-48.) Based on this assessment, Dr. Lin opined that Plaintiff did not have lupus and her only limitation was a right shoulder injury.[10] (R. at 232.)

### C.  The ALJ's Decision

On January, 13, 2005, the ALJ issued his decision.  He determined that the Plaintiff "retain[ed] the residual functional capacity to perform a range of light work." (R. at 20.)  The ALJ credited Plaintiff's right shoulder impairment but discounted her lupus testimony. *Id*.  In doing so, he set forth Plaintiff's relevant medical visits and cited a lack of "credible" medical evidence, conservative treatment, and lack of a definitive lupus diagnosis. (R. at 19-20.)  The ALJ also discounted Plaintiff's subjective complaints of pain and weakness, citing lack of medical evidence for the pain and Plaintiff's continued activities. (R. at 19.)

Additionally, the ALJ discounted Dr. Chen's August 29, 2003, report because

> Dr. Chen's opinion of work limitations [was] not supported by the evidence of record considered as a whole, including the records of Dr. Chen.  The claimant underwent intermittent sporadic treatment and had generally unremarkable signs.  The claimant's major complaint was shoulder dislocation and she did not report signs or symptoms consistent with the opinion of Dr. Chen as regards any continuous period of not less than 12 months.

(R. at 18.)  Since Ms. Guillory's opinion that plaintiff could not work (in response to the second hypothetical) was based on Dr. Chen's report, the ALJ disregarded her opinion as to that hypothetical as well. [*See* R. at 20 (relying on the first hypothetical posed to Ms. Guillory).]

The ALJ also disregarded Dr. Birchall's July 2004 opinion that Plaintiff could work 6-8 hours because "[n]o opinion is set forth regarding duration, nor are there longitudinal objective medical records in support of the opinion rendered." (R. at 19.)  Ultimately the ALJ determined Plaintiff was able to return to her cashier and secretary positions and found she was not eligible for disability

---

[10] Dr. Lin's assessment of the Plaintiff is also consistent with the first hypothetical question posed by the ALJ.

benefits.

## II. LEGAL BACKDROP AND STANDARD OF REVIEW

### A. Legal Requirements as to Disability Benefits

Title II of the Social Security Act (hereinafter, "Act"), as amended, provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1)(D) (Supp. III 1982). Title XVI of the Act provides for the payment of disability benefits to indigent persons under the Supplemental Security Income (SSI) program. § 1382(a). Both titles of the Act define disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ." § 416(i)(1)(a). The Act further provides that an individual

> [S]hall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 423(d)(2)(a).

The Secretary of the Social Security Administration has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920 (1986). Step one determines whether the claimant is engaged in "substantial gainful activity." If (s)he is, disability benefits are denied. §§ 404.1520(b), 416.920(b). If (s)he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments. That determination is governed by the "severity regulation" at issue in this case. The severity regulation provides in relevant part:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to

do most jobs." §§ 404.1521(b), 416.921(b). Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting." *Id.*

If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments the Secretary acknowledges are so severe as to preclude substantial gainful activity. §§ 404.1520(d), 416.920(d); 20 C.F.R. pt. 404, subpt. P, App. 1 (1986). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from performing work (s)he has performed in the past. If the claimant is able to perform his/her previous work, (s)he is not disabled. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his/her previous work, the fifth and final step of the process determines whether (s)he is able to perform other work in the national economy in view of his/her age, education, and work experience. The claimant is entitled to disability benefits only if (s)he is not able to perform other work. §§ 404.1520(f), 416.920(f).

### B.     Standard of Review

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). In a Social Security case, the Commissioner's denial of benefits "will be disturbed only if it is not supported by substantial evidence or is based on legal error." *Brawner v. Sec'y of Health and Human Servs.*, 839 F.2d 432, 433 (9th Cir. 1988) (citing *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Sandgathe v. Charter*, 108 F.3d 978, 980 (9th Cir. 1997) (citation omitted). "[I]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

1  1995)). The court must consider the record as a whole, examining both the evidence which supports
2  the ALJ's conclusions and that which detracts therefrom. *Jones v. Heckler*, 760 F.2d 993, 995 (9th
3  Cir. 1985). "In reaching his findings, the law judge is entitled to draw inferences logically flowing
4  from the evidence." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  If the evidence
5  supports more than one rational interpretation, the court must uphold the ALJ's decision. *Allen v.*
6  *Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Thus when the evidence is inconclusive, "questions of
7  credibility and resolution of conflicts in the testimony are functions solely of the Secretary."
8  *Schweiker*, 694 F.2d at 642 (internal quotations and citation omitted).

10  **III.    DISCUSSION**

12  **A.    The Hypothetical(s) Posed to the Vocational Expert.**
13  Plaintiff argues the ALJ posed an incomplete hypothetical question to the vocational expert,
14  Ms. Guillory, and therefore could not rely on her response. (Pl.'s Obj. to R. & R. 1.) Plaintiff further
15  objects to the Report's statements that although the ALJ's hypothetical question to Ms. Guillory was
16  unclear, it was cured by the subsequent hypothetical question by Plaintiffs attorney. (*Id.*; R. & R. 14.)
17  Plaintiff also unconvincingly argues the ALJ's hypothetical question was "qualitatively different"
18  from the hypothetical question submitted by Plaintiff.
19  The Plaintiff attempts to isolate a portion of the hypothetical question in which the ALJ stated
20  Plaintiff "*may* work above shoulder level with the right upper extremity." [R. at 308 (emphasis
21  added).] Plaintiff contends the hypothetical question was incomplete because Plaintiff cannot work
22  above shoulder level and the subsequent response by Ms. Guillory provides no evidentiary value.
23  (Pl.'s Obj. to R. & R. 1-2; Pl.'s Mem. Supp. Sum J. 4, 5:22-6:14.) However, Plaintiff's selective
24  quotation of the record excludes the first half of the ALJ's sentence. The full sentence reads: "She
25  would need to avoid overhead controls, working -- may work above the shoulder level with the right
26  upper extremity . . . ." (R. at 308.)  When read in full context, the ALJ's sentence is notably
27  incongruous. In full context, it appears that the ALJ states the Plaintiff is, simultaneously, both able
28

- 11 -                                            05CV2251

and unable to work above shoulder level.[11]

Had the hearing ended immediately after Ms. Guillory's response to the ALJ's first hypothetical question, there would be sufficient cause to remand this case. However, that was not the case, the hearing and additional questioning continued. (R. at 308-10.) It would appear that Plaintiff urges the Court to focus "solely" on the questioning by the ALJ -- in essence ignoring the further inquiries made by Plaintiff's counsel and segmenting the testimony into isolated sub-parts. (R. at 309-10.) That would be nonsensical.

Plaintiff asked a clarifying question of Ms. Guillory regarding the first hypothetical and was ultimately able to clear any confusion posed by the ALJ's initial questioning. Plaintiff's examination of Ms. Guillory consisted of one question:

> Q   I just have one question and that is, with the first hypothetical which I believe corresponds to Exhibit 5F [Record pages 189-200] -- but nevertheless, would the Claimant or the hypothetical person be able to perform the Claimant's past relevant work if her lifting and carrying were limited to the level of the waist for the 20 pounds occasionally and the level of the waist at 10 pounds frequently, *so all her lifting and carrying would be at the waist level*?

[R. at 309 (emphasis added]. Plaintiff's restriction to the first hypothetical question limited Plaintiff's activity to *waist* level. As Judge Papas' correctly pointed out, this limitation is *more restrictive* than Plaintiff's *actual* abilities since Plaintiff is capable of performing work from the waist to shoulder area. (R. & R. 16.) Despite the hypothetical's added restrictiveness, Ms. Guillory opined that the "erosion [to the Plaintiff's secretarial abilities] would be so slight, it would be negligible." (R. at 310.) Such a condition would not preclude Plaintiff from performing her past secretarial position. *Id.* Ms. Guillory further explained that Plaintiff could still perform 65%-80% of cashier jobs comparable to her past position as "generally performed." *Id*. The discounted percentage specifically took into consideration the proposition that Plaintiff would be unable to "lift anything above the waist." *Id.*

Plaintiff also argues her hypothetical question was "qualitatively different" from that of the

---

[11] Defendant has suggested the Court "assume the ALJ said 'no' work above the shoulder rather than 'may' work above the shoulder" because the ALJ knew about Plaintiff's impairment and did not suggest Plaintiff could perform above-shoulder work elsewhere in the record. (Mem. Points Authorities Supp. Def's Cross-Mot. 10:21-26.)  While temptingly simplistic, the Court is ultimately unpersuaded by the Defendant's "transcription error" argument. No evidence has been provided by either party to support this contention. Accordingly, the Court cannot assume the ALJ meant anything other than the words that were transcribed. (R. at 308.)

ALJ.  (Pl.'s Obj. to R. & R. 1-3.) Specifically, Plaintiff argues her hypothetical question cited strength based "exertional limitations," while the ALJ's hypothetical question "cited non-exertional, manipulative limitations which were not part of his final residual functional capacity." *Id.* at 2. Plaintiff further argues her hypothetical question "did not address the myriad of non-exertional manipulative work functions necessary for work activities such as overhead work, above the shoulder work, operating overhead controls, reaching, handling, fingering [,] etc." *Id.*

Plaintiff's argument only has merit if the hearing record is viewed in piecemeal segmentation. Despite Plaintiff's contentions that suggest otherwise, it is not necessary for the ALJ to repeat Counsel's hypothetical in order to utilize it in his determination. (Pl.'s Mem. Supp. Sum J. 4-6.)  It is unnecessary to segregate the first hypothetical into isolated sub-parts by the respective questioner. The ALJ was present for Ms. Guillory's *entire* testimony and he also listened to Ms. Guillory's response to the more restricted hypothetical questioning.  The ALJ, therefore, could reasonably rely on Ms. Guillory's subsequent answers and opinion in making his final conclusions.

Furthermore, contrary to Plaintiff's contention, the ALJ did explore the physical and mental demands of her past relevant work.  Ms. Guillory testified that Plaintiff's work as a cashier was performed at a "light exertional level" and was "semi-skilled"; whereas, her job as a secretary was "sedentary" and "skilled." (R. at 307.)  Limitations are classified as exertional if they affect your ability to meet the strength demands of jobs. *See* 20 C.F.R. 416.969a.  "The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* "Limitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." *Id.*

The ALJ may determine the nature of Plaintiff's past job duties (as actually performed) from one of two acceptable sources: "a properly completed vocational report, SSR 82-61, and the claimant's own testimony, SSR 82-41." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001). Plaintiff completed a vocational report in which she described her duties as they pertained to her prior positions

of employment. (R. at 61-68). Specifically, Plaintiff testified that she worked as a cashier in 1998.[12] (R. at 270.) This corresponds with the position Plaintiff described in her Work History Report. (R. at 67.) In the vocational report, Plaintiff describes her cashier duties: "Cash register operations Completing of balance sheet at end of shift." *Id.* She further listed the position's lifting and carrying requirements: "occasionally it would require stocking inventory + preparing displays, that required lite [sic] lifting." *Id.*

Having reviewed the "vocational statement of record," Ms. Guillory testified that "[t]he position of cashier is classified as light work, semi-skilled, *actually and customarily performed are consistent*." [R. at 307 (emphasis added)]. In addition, when Plaintiff restrictively clarified the first hypothetical question, Ms. Guillory responded: "The cashier position, the one she was actually performing, would be fine, because -- *as she described it*. It would be fine as actually performed." [R. at 310 (emphasis added)].

Although the ALJ did not question Plaintiff about her cashier job, the vocational report provided an independent source upon which the ALJ could rely. The vocational report also provided Ms. Guillory the necessary information to opine whether Plaintiff could perform her cashier position as actually performed. Ms. Guillory's testimony indicates that she indeed considered Plaintiff's description of her duties. *Id.* Therefore, the ALJ fully developed the record with regard to plaintiff's cashier job as actually performed. Accordingly, the testimony in the record indicates that Plaintiff can still perform at least one of her past relevant jobs, thereby demonstrating that the ALJ did not err.

To summarize, the ALJ's first hypothetical question to Ms. Guillory, while contradictory and seemingly unclear, was cured by Counsel's subsequent clarification. The ALJ was present for Ms. Guillory's *entire* testimony and listened to Ms. Guillory's response to the more restricted hypothetical questioning. Accordingly, the ALJ could reasonably rely on Ms. Guillory's subsequent answers and opinion in making his final conclusions (the administrative hearing must be considered as a whole). Plaintiff's "qualitatively different" argument is unconvincing. As Judge Papas' appropriately determined, Plaintiff's clarification to the first hypothetical question provides a sufficient basis in the

---

[12] Since the record does not adequately indicate whether Plaintiff's secretarial position involved duties not generally associated with the position, the Court will instead focus on Plaintiff's cashier position where no indication lies in the record that duties, which are not generally associated with the position, are involved. (*See generally,* R. & R. 28-30.)

- 14 -                                                                                                                05CV2251

record to convince the Court that Ms. Guillory's opinion was based on factors that reflected Plaintiff's true residual functional capacity.  (*See* R. & R. 16.)

### B. Systemic Lupus Erythematosus (SLE)

Plaintiff also formally objects to the alleged *post hoc* argument in the Report supporting the ALJ's decision that Plaintiff's SLE was not a severe impairment. [Pl.'s Obj. to R. & R. 3 (referring to R. & R. 16-19).] Plaintiff cites several cases in opposition to *post hoc* determinations but fails to acknowledge the Report's numerous direct references to the ALJ's determinations.  While the Report also includes direct citations to the overall record, there are also sufficient references to the ALJ's actual decision.

For example, the Report discussed:

> In positing Plaintiff's residual functional capacity to Ms. Guillory, the ALJ excluded Plaintiff's lupus claim while including her photosensitivity.  The ALJ did this because
>
>> Dr. Chen notes a diagnosis of possible lupus, but that diagnosis is not clinically confirmed.  In fact, Dr. Pincus, a rheumatologist, specializing in the treatment of conditions such as lupus, opined that the claimant had only mild lupus, at most, but did note definitively diagnose the claimant with that condition.  Regardless, Dr. Pincus indicated that the claimant had [] an excellent response to treatment with her medications, including Voltaren.
>> . . . [.]
>> I also note that the treatment records reflect only intermittent reports of the claimant's purported symptomology with sporadic conservative treatment and inconsistent laboratory findings.  No physician of record has opined . . . [.] that the claimant's impairments are more limiting than found by the undersigned [Administrative] Law Judge.
>
> (R. at 17, 20.)

(R. & R. 16.)

In his decision, the ALJ also noted his difficulties with relying on the medical opinion of Plaintiff's treating physician, Dr. Chen.  (R. at 17.)

> The [ALJ] has considered the opinion and assessment from Dr. Chen , dated August 29, 2003, stating that although the claimant was physically capable of performing a range of light work, she could not do so in the competitive workplace.  In addition, Dr. Chen opined that the claimant should not work outdoors.  In so opining, Dr. Chen diagnosed possible lupus, with systems of generalized pain and weakness.  Dr. Chen admitted that the length of treatment was unknown, and did not set forth an opinion of duration. . . . Ordinarily, the opinion of a treating physician is accorded great weight (*Magallenes* [sic] *v. Bowen,* 881 F.2d 751 (9th Cir. 1989)).  The [ALJ] is unable to assign controlling weight to the opinion of Dr. Chen, however, inasmuch as that opinion is conclusory, is set forth on a checklist form supplied by counsel, and provides no supporting objective medical data consistent therewith.

(R. at 17.) The opinions of treating physicians carry substantial weight in the disability determination. *Magallanes*, 881 F.2d at 751. "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability." *Id*. "The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted." *Id*. To ignore a treating physician's opinion, the ALJ must provide "specific, legitimate reasons for doing so that are

based on substantial evidence in the record." *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Whereas, if the ALJ ignores *uncontroverted* medical evidence, he must provide clear and convincing reasons to support his decision. *Magallanes*, 881 F.2d at 751. If the ALJ ignores controverted opinions, he must provide specific, legitimate reasons for doing so. *Holohan v. Massanari*, 246 F.3d 1195, 1203

(9th Cir. 2001).

For example, an ALJ may disregard an opinion because it is "brief and conclusionary in form with little in the way of clinical finding to support [its] conclusion . . . ." *Id*. (quoting *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (alteration in original). *See Saelee v. Chater*, 94 F.3d 520, 522-523 (9th Cir. 1995), *cert. denied*, 519 U.S. 1113 (1997) (ALJ may consider the purpose for which a medical report was obtained); *See also Burkhart v. Bowen*, 856 F.2d 1335, 1339 (9th Cir. 1988) (consideration of the fact that a doctor's report was solicited by claimant's counsel was a permissible credibility determination given all of the evidence before the ALJ); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly rejected "checkoff" forms that did not contain any explanation for the limitations shown); *Murray*, 722 F.2d at 501 (expressing preference for individualized medical opinions over check-off reports).

Since the record contains factors that simultaneously support and refute Plaintiff's lupus claim, it is solely within the province of the ALJ to resolve the conflict. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). The present case is not one in which the ALJ ignored a conclusive diagnosis. Ultimately the record contains one opinion that Plaintiff does not have lupus, two cautious opinions that Plaintiff may have lupus, and no definitive diagnosis that Plaintiff has lupus. (R. at 16-20.) The ALJ in this case rejected Dr. Chen's views, as expressed in the Physical Capacity Assessment form, because:

> [the] opinion is conclusory, is set forth on a checklist form supplied by counsel, and provides no supporting objective medical data consistent therewith. For example, Dr. Chen notes a diagnosis of possible lupus, but that diagnosis is not clinically confirmed. . . . Further, in April 2002, Dr. Chen opined that the claimant was not disabled and prescribed aerobic exercise. . . . In sum, Dr. Chen's opinion of work limitations is not supported by the evidence [in the] record considered as a whole, including the records of Dr. Chen.

(R. at 17-18.). Similarly, the ALJ discounted Dr. Birchall's opinion that Plaintiff could work between 6 and 8 hours because "[n]o opinion is set forth regarding duration, nor are there longitudinal objective medical records in support of the opinion rendered." (R. at 19.) It should be noted that nothing in the record suggests that the ALJ ever doubted Dr. Chen or Dr. Birchall's designations as treating physicians. Even under the more stringent "clear and convincing reasons" standard, the reasons stated within the ALJ's decision for disregarding Dr. Chen's and Dr. Birchall's opinions are sufficient. Both Dr. Birchall and Dr. Chen issued conclusory opinions that lacked sufficient objective medical support. The ALJ included both doctors' findings in his decision before discounting them *and* explained why he discounted them. (R. at 16-20.)

Therefore, based on a review of the record and the preceding analysis, the Court finds the ALJ did not err in discounting Dr. Chen and Dr. Birchall's opinions, even with treating physicians' designations. Furthermore, since Dr. Chen's opinion was the basis for the ALJ's second hypothetical question, the Court also finds the ALJ did not err in ignoring Ms. Guillory's response to the second hypothetical question. Finally, Plaintiff's objection to the *post hoc* argument, allegedly within Judge Papas' Report, supporting the ALJ's decision that Plaintiff's SLE was not a severe impairment is irrelevant because the ALJ has noted sufficient findings regarding the Plaintiff's lack of disability on the face of his decision. (Pl.'s Obj. to R. & R. 3; R. & R. 16.)

Based on a review of the record, the ALJ's decision to discount Plaintiff's lupus' claim is supported by substantial evidence. Hence, the ALJ did not err by excluding lupus from his disability determination.

### IV. CONCLUSION

After reviewing the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion, the Court finds the ALJ provided specific, legitimate reasons

for his conclusion. Substantial evidence exists to support the ALJ's findings. Moreover, after making a *de novo* review of the entire Report, the Court fully agrees with Judge Papas' reasoning and conclusions discussed therein.

Therefore, Judge Papas' Report is **ADOPTED** in full and further **SUPPLEMENTED** by this **ORDER**. For the reasons stated in the Report and cited herein, Plaintiff's motion for summary judgment is **DENIED** and Defendant's cross-motion for summary judgment is **GRANTED.**

**SO ORDERED**.

DATED: March 19, 2007

Hon. Roger T. Benitez
United States District Judge